IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

OLD DOMINION ELECTRIC COOPERATIVE,

        **Plaintiff,**

v.                                    **Civil Action No. 3:19cv233**

PJM INTERCONNECTION, LLC,

        **Defendant.**

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiff Old Dominion Electric Cooperative's ("ODEC") Motion to Remand, (ECF No. 13), and Defendant PJM Interconnection, LLC's ("PJM") Motion to Dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6),[1] (ECF No. 3). PJM responded to the Motion to Remand, (ECF No. 20), and ODEC replied, (ECF No. 22). ODEC responded to the Motion to Dismiss, (ECF No. 15), and PJM replied, (ECF No. 21). The matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. Because ODEC's claims raise a substantial federal question under the filed-rate doctrine, this Court has jurisdiction, meaning that it will deny ODEC's Motion to Remand and grant PJM's Motion to Dismiss.

---

[1] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

## I.  Factual[2] and Procedural Background

This case arises from an unprecedented January 2014 weather event during which, as ODEC describes, the Mid-Atlantic region "experienced unique cold weather conditions known as 'the Polar Vortex Event' including record low temperatures across the United States." (Am. Compl. ¶ 15.) Circumstances caused by the Polar Vortex contributed "to a 2.9% drop in GDP." (*Id.* ¶ 16).

ODEC, a non-profit wholesale generation utility operating three facilities in Virginia and Maryland (known as Marsh Run, Louisa, and Rock Springs), brings four Virginia State law claims against PJM for damages stemming from the Polar Vortex of 2014.  (Am. Compl. ¶¶ 1, 4.)  PJM is a "regional transmission organization" that exercises "broad responsibility relating to the supply of wholesale electric power" throughout the thirteen states in the Mid-Atlantic region. (*Id.* ¶¶ 5, 7, 9.)  PJM ensures that sufficient power "is available to meet customer demands" within its region.  (*Id.* ¶ 8.)  PJM exerts operational control over, but not ownership of, the transmission facilities belonging to its participating members.  (*Id.*)

ODEC's spartan Amended Complaint perhaps artfully omits direct reference to the Federal Energy and Regulatory Commission ("FERC") or federal law, instead contending that it brings breach of contract and other state claims which stem from an agreement "outside of the requirements, restrictions, and protections set forth in any tariff[3] or other regulated PJM policy

---

[2] For the purpose of the Rule 12(b)(6) Motions to Dismiss, the Court will accept the well-pleaded factual allegations in ODEC's Complaint as true, and draw all reasonable inferences in favor of ODEC. *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) ("a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'") (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

[3] While ODEC mentions the federal tariff only to say it does *not* pertain to its state breach of contract claims, as explained in detail later, FERC regulates the operation of a tariff that sets

or process." (*Id.* ¶ 49.) Because ODEC's claim for relief mirrors those made in several other lawsuits—including some involving the very same parties—the Court describes the essential background of those suits which arose from the effect of the 2014 Polar Vortex on the wholesale electricity market in which ODEC and PJM participate.

## A.     **ODEC and PJM's Relationship in the Mid-Atlantic Energy Market**

Prior court decisions and other public records detail[4] the previous litigation between ODEC and PJM (and others) stemming from the 2014 Polar Vortex and its effects on the wholesale electricity market.

---

rates which can be charged in the wholesale electricity market in the Mid-Atlantic region (the "PJM Tariff"). The PJM Tariff—which governs the electricity purchasing relationship between ODEC and PJM (and others)—carries the force of federal law. *Bryan v. BellSouth Communs.*, 377 F.3d 424, 429 (4th Cir. 2004) (concluding that a federal tariff filed with and approved by a regulatory agency "carries the force of federal law"). That precept cannot be, and is not, controverted by either party.

ODEC seeks to pursue its Virginia state law action in state court. While PJM suggests in its briefing that the Court may take judicial notice of the federally-governed PJM Tariff and its terms, it seems questionable that the Court need take judicial notice of an agreement that bears the force of federal law. *See Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000); *Marcus v. AT&T Corp.*, 138 F.3d 46, 56 (2d Cir. 1998); *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 487 (7th Cir. 1998); *United States v. Rivero*, 532 F.2d 450, 458 (5th Cir. 1976) ("[t]he law is a fact and the Court is presumed to know the law or find it"). To the extent it is required to do so, the Court takes judicial notice of the PJM Tariff.

[4] Again, although ODEC's Amended Complaint omits any reference to FERC or federal regulation of energy markets, the Court will consider two previous actions involving ODEC and PJM and their interaction during the Polar Vortex for their description of the Mid-Atlantic energy market: (1) FERC's ruling in *Old Dominion Elec. Coop.*, 151 F.E.R.C. ¶ 61,207 at 62,285 (F.E.R.C. June 9, 2015); and, (2) the United States Court of Appeals for the D.C. Circuit's decision in *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1227 (2018).

While some courts suggest that a court should take judicial notice of previous court filings and rulings, *see Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 397 (4th Cir. 2006) (allowing a court to take judicial notice of relevant records and holding that "the court's consideration of the prior judicial record did not convert Appellee's motion to dismiss into a motion for summary judgment"), it is not clear to this Court that it need take judicial notice here. The previous filings cited involve the same parties disputing the same events before other decision-making bodies.

As described in these cases, and as established before this Court, the Federal Power Act

("FPA") and FERC govern the relationship between PJM and ODEC. The FPA requires FERC

to ensure that "[a]ll rates and charges made, demanded, or received by any public utility for or in

connection with the transmission or sale of electric energy subject to the jurisdiction of the

Commission . . . shall be just and reasonable." 16 U.S.C. § 824d(a). Pursuant to the FPA and

FERC's rule-making authority, regional transmission organizations, such as PJM, file tariff rates

for approval with FERC. *ODEC*, 892 F.3d at 1227.

Importantly, the rates actually charged may not exceed those filed with FERC (which, in

regulatory terms, is characterized as the "filed-rate doctrine"). Here, PJM filed, and FERC

approved the PJM Tariff. *Id.* at 1228. The PJM Tariff enumerates the terms and conditions

regarding PJM's responsibilities and the structure of the energy market system in the Mid-

Atlantic. *Id.* ODEC, as a generating utility, subscribes to the PJM Operating Agreement which

reflects the terms of the PJM Tariff. *Id.*

---

In the numerous filings before this Court, both Parties refer to the PJM Tariff, the D.C. Circuit decision, and the FERC decision without challenging the authenticity of those documents or rulings. Neither party contests the facts describing the wholesale energy market; instead they repeatedly refer to them in briefing. Where the plaintiff "has actual notice of all the information in the movant's papers and has relied upon those documents in framing the complaint," other measures, such as converting the motion to dismiss into one for summary judgment, becomes unnecessary. *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

Nonetheless, to the extent the Court need take judicial notice of the related agency or court decisions, it does so here. *See White v. Keely*, 814 F.3d 883, 885 n.2 (7th Cir. 2016); *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 802–03 (8th Cir. 2002) (concluding that "courts may rely on matters within the public record" in deciding motions on pleadings when recounting, for purposes of a Rule 12(b)(6) motion, previous related cases—including criminal cases assessing the same conduct at bar); *Cortec*, 949 F.2d at 48 (determining that a court may consider documents such as affidavits or matters of public record at the motion to dismiss stage where, as here, both parties had notice of their contents and the documents are integral to the complaint).

The sale of electricity on the PJM market generally occurs through three types of competitive auctions. *Id.* at 1227. In same day auctions, generating utilities, such as ODEC, "bid to provide the immediate delivery of electricity needed to slake sudden spikes in demand." *Id.* In "next day" or "day ahead" auctions, generating utilities bid to satisfy short term demand. *Id.* at 1227–28. And in a capacity auctions, generating utilities make longer term bids which bind them to provide energy at a certain price in the future. *Id.* at 1227. These competitive auctions, governed by federal law, set a cap on the prices at which generators such as ODEC may offer production to PJM. *Id.* at 1228. The PJM Tariff then capped prices in the next day or day-ahead market at $1000 per megawatt-hour. (*See* Rolphe Decl., PJM Tariff § 1.10.1A(d)(viii), ECF No. 3-2); *see also ODEC*, 892 F.3d at 1228.

The PJM Operating Agreement specifies that PJM may take "measures appropriate to alleviate an Emergency, in order to preserve reliability" in the Mid-Atlantic electrical market. (Rolphe Decl., PJM Operating Agreement § 1.6.2(vii), ECF No. 3-1.) Pursuant to that authority, PJM may direct generators "to start, shutdown, or change output levels of generations units." (*Id.* ¶ 1.7.20(b).) Generation capacity resources are contractually obligated "to offer all of those units' available generation capacity into PJM's daily market, and to generate electricity whenever called upon by PJM." *ODEC*, 892 F.3d at 1227. With this overview in mind, the Court turns to the facts of this case.

**B.     Factual Background**

The facts of this case are not in dispute. (*See* PJM Mot. Dismiss 7–11; ODEC Opp. Mot. Dismiss 2–6, ECF No. 15). In January 2014, an extraordinary Polar Vortex brought record-low temperatures to the Mid-Atlantic region, draining energy production resources. (Am. Compl ¶ 15.) Due to the weather conditions, the price of natural gas temporarily increased sharply.

5

Indeed, ODEC alleges that "[b]oth PJM and ODEC knew at the time . . . that the price of natural gas was 3,330 percent higher than it had been before the Polar Vortex event was forecast and began." (*Id.* ¶ 45.)

PJM found it necessary "to undertake extraordinary measures to ensure the supply of sufficient power generation resources" in order to maintain system reliability. (*Id.* ¶ 17.) ODEC alleges that, during this time, PJM induced them "to enter into binding commitments to purchase natural gas to run its units" by "promising to make ODEC whole for its fuel and other costs associated with purchasing the natural gas." (*Id.* ¶ 18.)

Specifically, on January 7, 2014, PJM contacted ODEC's agents in North Carolina and requested that ODEC run the Rock Springs combustion turbine facility. (*Id.* ¶ 23.) After ODEC purchased gas to run those units, PJM later cancelled its request. (*Id.* ¶ 24.) Similarly, on January 22, 2014, PJM requested that ODEC run several of the Louisa and Marsh Run combustion turbine units. (*Id.* ¶ 27.) After ODEC purchased gas to run those units, PJM cancelled the request to run the Louisa units, and cut short the hours for the Marsh Run units. (*Id.* ¶¶ 29, 32.) This cycle repeated itself three times until January 28, 2014. (*See id.* ¶¶ 34, 37, 41.) PJM would request that ODEC operate various combustion units, and then would either cancel or significantly scale back its request. ODEC alleges that throughout these communications, PJM promised in recorded conversations "that if ODEC procured the gas necessary to run the units then PJM would pay ODEC for the costs it incurred to procure the gas and ready the units." (*Id.* ¶ 44.) Because they purchased gas priced at emergency levels (1) at PJM's direction and (2) based on a promise to make ODEC whole, ODEC alleges that PJM's breach of its oral contract caused ODEC $14,925,669.58 in damages. (*Id.* ¶ 57.)

ODEC submits that the public policy consequences of this case are staggering. It contends that "[i]f PJM does not fulfill its promises . . . then PJM will have no credibility or effective authority to make any future promises under similarly extraordinary circumstances to prevent sudden, widespread, and potentially catastrophic failure of power systems throughout the Mid-Atlantic region." (*Id.* ¶ 22.)

## C.   Prior Actions and Procedural History

ODEC first sought recompense through the regulatory process. In a June 2014 administrative proceeding before FERC, ODEC unsuccessfully sought relief from FERC for the "natural gas-related costs" it "incurred as a result of its efforts to meet PJM's commitment of ODEC's Generation Capacity Resources during the cold weather events of January 2014." *ODEC*, 151 F.E.R.C. ¶ 61,207 at 62285. In that case, ODEC sought reimbursement for costs incurred during the Polar Vortex, including:

> (1) actual costs greater than $1,000/megawatt-hour (MWh) incurred for running units according to PJM dispatch instructions on January 23, 2014; (2) costs incurred for natural gas purchased but not burned for units PJM committed but did not dispatch (ODEC characterizes this as a canceled dispatch); and (3) costs incurred for natural gas purchased but not burned due to PJM's curtailment of a dispatch period.

*Id.* Before FERC, ODEC did not dispute that "natural gas cost recovery is not currently allowed by the PJM [Tariff] or Operating Agreement," *id.* at 62293, but argued that, given the lack of flexibility in the PJM Tariff rate and considering equitable principles, FERC should grant a retroactive waiver of the $1000 MWh filed rate. Altogether, ODEC sought a "retroactive waiver . . . [of the PJM Tariff controlled rate cap] totaling $14,925,669.58 incurred prior to the date on which it made its waiver filing." *Id.* The monetary demand before FERC matches the damages sought in this case to the penny.

7

Before FERC, PJM actively supported a waiver for ODEC's claim to relief in recognition

of the extraordinary circumstances facing the wholesale energy market during the 2014 Polar

Vortex. *Id.* at 62289. Despite PJM's intervention, FERC denied relief. FERC concluded "that

the filed-rate[5] doctrine and the rule against retroactive ratemaking[6] preclude[d] granting

ODEC's waiver request." *Id.* at 62293. Notwithstanding this decision, in a related case, FERC

issued a contemporaneous order that "finding that PJM's . . . Operating Agreement may be

unjust, unreasonable, unduly discriminatory or preferential."[7] *Id.* at 62294.

---

[5] The "filed-rate doctrine mandates that the rate of the carrier duly filed is the only lawful charge." *Bryan*, 377 F.3d at 429 (internal quotation marks omitted). The Supreme Court of the United States has established that the filed-rate doctrine forbids a federally regulated seller of energy on the interstate market from charging rates higher than those filed with FERC. *See Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 573 (1981). The filed-rate doctrine, alongside the rule against retroactive ratemaking, "operate as a nearly impenetrable shield for consumers, ensuring rate predictability and preventing . . . extortionate pricing." *ODEC*, 892 F.3d at 1230–31 (internal citations omitted) (noting that the Supreme Court explained in its *Arkansas Louisiana Gas Company* decision that not even FERC had authority to contravene the prospective application of rates).
    As explained later, the filed-rate doctrine compels this Court's findings that it possesses jurisdiction over, and must dismiss, the case at bar.

[6] "[T]he rule against retroactive ratemaking 'prohibits the Commission from adjusting current rates [retroactively] to make up for a utility's over-or under-collection in prior periods.'" *ODEC*, 892 F.3d at 1227 (quotations and citations omitted) (noting that, as here, neither of the two "limited" exceptions to this otherwise categorical prohibition applies).

[7] Indeed, FERC Commissioner Philip D. Moeller dissented, arguing in equitable terms that ODEC "acted in good faith to preserve system reliability during a time of extraordinary system stress and deserve[s] appropriate compensation." *ODEC*, 151 F.E.R.C. ¶ 61,207, 62294. Noting the particularly hard impact on ratepayers, the dissent observed that "PJM is the only regional transmission organization that does not allow market participants to submit day-ahead offers that vary by hour to update their offers in real time." *Id.* While urging PJM to implement tariff changes allowing "generators in PJM . . . to recover legitimate, actual fuel costs incurred to ensure that they can provide service during emergency conditions," *id.* at 62295, the dissent expressed full support for "the Commission's action to remedy any defects in PJM's current market construct that do not provide adequate supply offer flexibility, in order to prevent the circumstances faced by ODEC from recurring." *Id.*

FERC denied ODEC's request for rehearing. *ODEC*, 154 F.E.R.C. ¶ 61,155 (F.E.R.C. Mar. 1, 2016). In denying the request for a rehearing, FERC found that "equitable considerations do not bestow upon the commission the authority to waive the filed-rate doctrine," (*id.* ¶ 17), and that the "extraordinary circumstances" during the 2014 Polar Vortex did not give ratepayers the required notice of the rate change, (*id.* ¶ 23). FERC affirmed the Commission's prior finding that ODEC's request is barred by the filed-rate doctrine and the rule against retroactive ratemaking. (*Id.* ¶ 26.)

ODEC then filed an appeal in the D.C. Circuit. *ODEC*, 892 F.3d 1223. ODEC conceded that "the filed [PJM] Tariff categorically precluded its compensation for losses caused by the rate cap" but sought relief "entirely on [the] grounds of fairness and equity." *Id.* at 1230– 31. The D.C. Circuit, like FERC, denied relief. Judge Millett, writing for the panel, found that the "filed-rate doctrine and the rule against retroactive ratemaking leave the Commission no discretion to waive the operation of a filed-rate or to retroactively change or adjust a rate for good cause or for any other equitable considerations." *Id.* at 1230. ODEC appealed, and the Supreme Court denied certiorari. *Old Dominion Elec. Coop. v. FERC,* 139 S. Ct. 794 (2019).

On January 5, 2017, ODEC filed a Complaint against PJM in the Circuit Court for the County of Henrico, Virginia (the "Henrico County Circuit Court"). (*See* ODEC Mem. Opp. Mot. Dismiss 5, ECF No. 15.) ODEC never served PJM with that Complaint, and on January 3, 2018, ODEC exercised its right to take a non-suit pursuant to Virginia Code § 8.01-380. (*Id.*) Nearly six months after non-suiting the case, on June 5, 2018, ODEC refiled the lawsuit against PJM in Henrico County Circuit Court. (*Id.*) On February 22, 2019, ODEC filed the operative Amended Complaint which brings four claims against PJM: two claims for breach of contract, a claim for unjust enrichment, and a claim for negligent misrepresentation.

On April 3, 2019, PJM removed the case to this Court, claiming federal question jurisdiction. One week later, PJM filed the Motion to Dismiss. ODEC responded, and PJM replied. ODEC then filed the Motion to Remand, arguing that its Amended Complaint did not invoke federal jurisdiction because its claims arose only under state law and did not raise a substantial federal question. PJM responded, and ODEC replied. The Court now turns to the pending motions.

## II. Removal Jurisdiction and Remand

Under 28 U.S.C. § 1441(a),[8] a defendant may remove a civil action to a federal district court if the plaintiff could have originally brought the action in federal court. 28 U.S.C. § 1441(a). Section 1446 delineates the procedure for removal. *See* 28 U.S.C. §§ 1446(a), (d). The state court loses jurisdiction upon the removal of an action to federal court. 28 U.S.C. § 1446(d) ("[T]he State court shall proceed no further unless and until the case is remanded."). The removability of a case "depends upon the state of the pleadings and the record at the time of the application for removal. . . ." *Ala. Great S. Ry. Co. v. Thompson*, 200 U.S. 206, 216 (1906); *see also Pullman Co. v. Jenkins*, 305 U.S. 534, 537 (1939) ("the right to remove . . . [is] determined according to the plaintiffs' pleading at the time of the petition for removal."). Under

---

[8] Section 1441(a) provides, in pertinent part:

> [A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C. § 1441(a).

28 U.S.C. § 1447(c), "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c).

"The party seeking removal bears the initial burden of establishing federal jurisdiction." *Abraham v. Cracker Barrel Old Country Store, Inc.*, No. 3:11cv182, 2011 WL 1790168, at *3 (E.D. Va. May 9, 2011) (citing *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994)). No presumption favoring the existence of federal subject matter jurisdiction exists because federal courts have limited, not general, jurisdiction. *Id.* (citing *Pinkley Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999)). In deference to federalism concerns, courts must strictly construe removal jurisdiction. *Id.* (citing *Mulcahey*, 29 F.3d at 151). "If federal jurisdiction is doubtful, a remand is necessary." *Id.* (quoting *Mulcahey*, 29 F.3d at 151).[9]

### III. Standard of Review: Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for

---

[9] When assessing jurisdiction under removal and related motions to remand, the Court may consider matters outside the pleadings. *See Romano v. Kazacos*, 609 F.3d 512, 521 (2d Cir. 2010) (stating that a court may look behind a complaint when jurisdiction (such as a motion to remand) is at issue); *Indeck Maine Energy, L.L.C. v. ISO New England Inc.*, 167 F. Supp. 2d 675 (D. De. 2001) (deciding a telecommunications tariff case in part by considering affidavits and documents filed in support of and in opposition to the motions to remand, and to dismiss under 12(b)(6)); *Maryland v. Exxon Mobil Corp.*, 352 F. Supp. 3d 435, 466 (D. Md. 2018) (considering materials outside the pleadings on a motion to remand which "are essential to the jurisdictional analysis").

relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193. The Court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 676–79; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus., Inc.*, 637 F.3d at 440)). This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

"Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a

meritorious affirmative defense." *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013) (quoting *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011)).

## IV. Analysis: Motion to Remand and Motion to Dismiss

The Court has jurisdiction over this case because the Amended Complaint raises a substantial federal question by challenging a federal tariff with the force of federal law. For the same reasons the Court possesses jurisdiction, and because the Amended Complaint would contravene FERC's authority to set a reasonable rate for the provision of natural gas, this Court must dismiss ODEC's claims.

### A.    Legal Standard:  Complete Preemption and Federal Question Jurisdiction

Where state law gives rise to a plaintiff's cause of action, federal courts only possess jurisdiction to hear those "cases in which a well-pleaded complaint establishes that the plaintiff's right to relief depends on resolution of a substantial question of federal law." *Bryan*, 377 F.3d at 424 (internal quotation marks omitted). Generally, the plaintiff, as "master of the claim," may "avoid federal jurisdiction by exclusive reliance on state law" when drafting their complaint. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). Despite this, federal question jurisdiction may exist over state law claims under certain narrow exceptions, such as the complete preemption and substantial federal question doctrines.[10]

---

[10] As a corollary to the complete preemption and substantial federal question doctrines, the Fourth Circuit has recognized the "artful pleading" doctrine. *See Thigpen v. United States*, 800 F.2d 393, 396 (4th Cir. 1986) (finding a plaintiff cannot "bootstrap jurisdiction simply by the use of artful pleading") *overruled on other grounds, Sheridan v. United States*, 487 U.S. 392 (1988). Under this doctrine, "[a] plaintiff cannot avoid federal court simply by omitting to plead a necessary federal question in the complaint; in such a case the necessary federal question will be deemed to be alleged in the complaint." *Venezuela v. Massimo Zanetti Bev. USA, Inc.*, 525 F. Supp. 2d 781, 785 (E.D. Va. 2007) (internal citations omitted).

At base, the artful pleading doctrine provides that a "plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint." *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 22 (1983); *see also Marcus*, 138 F.3d at 55 ("[a] plaintiff

The Court now reviews the Complete Preemption and Substantial Federal Question doctrines, ultimately applying the substantial federal question doctrine to the claims before it.

### 1.    The Complete Preemption Doctrine

Under the complete preemption doctrine, federal question jurisdiction exists "when Congress 'so completely pre-empts a particular area that any civil complaint raising the select group of claims is necessarily federal in character.'" *Pinney v. Nokia, Inc.*, 402 F.3d 430, 449 (4th Cir. 2005) (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64 (1987)).  Complete preemption occurs only where "Congress has clearly manifested an intent to make causes of action removable to federal court." *Metro. Life*, 481 U.S. at 67–68 (internal quotation marks omitted).  Because of these stringent parameters, the Supreme Court has found that complete preemption only exists in three circumstances:  (1) claims under the Labor Management Relations Act brought by a labor union against an employer; (2) Employment Retirement and Insurance Security Act ("ERISA") cases brought by a beneficiary; and, (3) certain Indian land grant cases. *Marcus*, 138 F.3d at 54 (internal citations omitted).

Complete preemption differs from field preemption.  Complete preemption applies "when the preemptive force of a federal statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim." *Rosenberg v. DVI Receivables XVII, LLC*, 835 F.3d 414, 421 n.4 (3rd Cir. 2016) (internal quotation marks omitted); *see also, Pinney*, 402 F.3d at 449.  Field preemption, on the other hand, occurs where "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the states to supplement it." *Pinney*, 402 F.3d at 449 (internal quotation marks

---

may not defeat removal by clothing a federal claim in state garb, or, as it is said, by the use of artful pleading" (internal quotation marks omitted)).

omitted). Field preemption merely serves as a defense to a state law claim, does not affect subject matter jurisdiction, and "does not authorize removal to federal court." *Id.* (internal quotation marks omitted).

## 2. The Substantial Federal Question Doctrine

The substantial federal question doctrine permits removal of a state law claim where "plaintiff's ability to establish the necessary elements of his state law claims must rise or fall on the resolution of a question of federal law." *Pinney*, 402 F.3d at 449 (citing *Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 813 (1986)).

The Supreme Court has recently "brought greater clarity to what it describes as a traditionally 'unruly [substantial federal question] doctrine,' emphasizing its 'slim contours.'" *Flying Pigs, LLC v. RRAJ Franchising, LLC*, 757 F.3d 177, 182 (4th Cir. 2014). Under the *Gunn-Grable* framework[11] for reviewing the existence of a substantial federal question, a federal court has jurisdiction over state law claims when the "federal issue must be '(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.'" *Pressl v. Appalachian Power Co.*, 842 F.3d 299, 303 (4th Cir. 2016) (quoting *Gunn v. Minton*, 568 U.S. 251, 258 (2013)); *see also Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312–14 (2005). The

---

[11] Despite the Supreme Court's later clarification, the Fourth Circuit previously utilized a similar standard with the same effect. For instance, the Fourth Circuit's decision in *Bryan* predated the crystallization of the *Gunn-Grable* framework, finding substantial federal question jurisdiction in "only those cases in which a well-pleaded complaint establishes . . . that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Bryan*, 377 F.3d at 429 (internal quotation marks omitted). The standard used in *Bryan* thus closely tracks the *Gunn-Grable* framework. The Court applies both tests here, finding substantial federal question jurisdiction under both *Gunn-Grable* and the Fourth Circuit's approach in *Bryan*.

"mere presence of a federal issue" does not suffice to grant jurisdiction, nor does "a defense that raises a federal question." *Merrell Dow*, 478 U.S. at 808, 813.

Relevant here, in a case evaluating the removal of a North Carolina complaint seeking damages solely under state law for charges imposed by BellSouth that a consumer deemed unfair, the Fourth Circuit found substantial federal question jurisdiction where a state law claim would "seek[] to alter the terms of the relationship . . . set forth in a filed tariff." *Bryan,* 377 F.3d at 429; *see also NASDAQ OMX Grp., Inc. v. UBS, Sec., LLC*, 770 F.3d 1010, 1010 (2d Cir. 2014) (finding jurisdiction where state law "claims necessarily raised disputed and substantial issues of federal securities law concerning an initial public offering"). The Fourth Circuit did so because the rates a carrier such as BellSouth could charge were governed by the FCC through a tariff.[12] *Bryan,* 377 F.3d at 426. The Fourth Circuit opined that federal tariffs "are the law, not mere contracts" and suits to "enforce it, and even more clearly a suit to invalidate it as unreasonable under federal law . . . arise[] under federal law." *Bryan,* 377 F.3d at 429 (internal quotation marks omitted).

### B. The Court Has Jurisdiction Because ODEC's Challenge to a Federally Approved Tariff Constitutes a Substantial Federal Question

The Amended Complaint challenges a tariff that bears the force of federal law. Such a challenge raises a substantial federal question, which federal courts may resolve. Because that challenge would require the Court to determine a reasonable rate for natural gas, the Court will dismiss ODEC's claims pursuant to the filed-rate doctrine.

---

[12] Energy regulation and telecommunications regulation are "essentially the same form of regulation, the term 'common carrier' being generally used of firms providing transportation or communications and 'public utility' of firms providing electricity or gas." *Cahnmann*, 133 F.3d at 487.

### 1.    <u>Legal Standard: Federal Tariffs and the Filed-Rate doctrine</u>

Two related principles guide this Court's analysis. First, it is well established that a tariff filed with a regulatory agency carries the full force of federal law. *See Bryan,* 377 F.3d at 429 (citing *Cahnmann,* 133 F.3d at 488). Any state law claim that "effectively challenges" the tariff rate raises a substantial federal question in that it seeks to invalidate federal law. *Bryan,* 377 F.3d at 430.

Second, the "filed-rate doctrine" mandates that "the rate of the carrier duly filed is the only lawful charge." *Id.* at 429 (quoting *AT&T v. Cent. Office Tel., Inc.,* 524 U.S. 214, 222 (1998)). The Supreme Court has established that the filed-rate doctrine forbids a federally regulated seller of energy on the interstate market from charging rates higher than those filed with FERC. *See Ark. La. Gas,* 453 U.S. at 573. The filed-rate doctrine serves "to prevent discrimination among consumers and to preserve the rate-making authority of federal agencies." *Bryan,* 377 F.3d at 429; *see also Hill v. BellSouth Telcomms., Inc.,* 364 F.3d 1308, 1316 (11th Cir. 2004) ("[t]he purpose of the nondiscrimination principle underlying the filed-rate doctrine is to ensure that all . . . customers are charged the same rate for their service"). This ensures rate predictability and prevents extortionate pricing.[13] *ODEC,* 892 F.3d at 1230 (citations omitted).

The filed-rate doctrine also ensures that claims affecting a tariff rate are nonjusticiable. Even where a legal challenge does not explicitly attack the filed rate, the reviewing court must dismiss the claim if an award of damages would "effectively impose a rate different from that dictated by the tariff." *Bryan,* 377 F.3d at 430 (citing *Hill,* 364 F.3d at 1317). The effect, not the

---

[13] The corollary rule against retroactive ratemaking serves essentially the same purposes. *See ODEC,* 892 F.3d at 1227 (quotations and citations omitted).

form, of the suit controls. If a claim requires a court to set a "reasonable rate," in contravention of FERC's exclusive authority, the Court must dismiss the claim. *Id.* at 430.

## 2. Federal Question Jurisdiction Exists Because ODEC's State Law Claims Effectively Challenge the PJM Tariff

Under these principles, this Court may assert jurisdiction if ODEC's state law claims "effectively challenge[]" the rates in the PJM Tariff. *Bryan,* 377 F.3d at 430. ODEC's state law claims have precisely that effect. First, for the reasons stated below, ODEC's state law claims fall within the subject matter of the PJM Tariff, which outlines the contractual relationship between the Parties. Second, fulfillment of ODEC's claims would violate the filed-rate doctrine, as granting damages would undermine (1) FERC's authority to set a reasonable rate; and, (2) discriminate between consumers. As a result, the Court must dismiss ODEC's claims.

### a. ODEC's Claims Fall Within the Relationship Between ODEC and PJM Arising Under Federal Law

As a threshold matter, ODEC's claims fall within "the terms of the relationship" between ODEC and PJM as articulated under federal law. *Bryan,* 377 F.3d at 429. At the time of the 2014 Polar Vortex, the PJM Tariff capped the prices at which ODEC and other generators could offer their capacity at $1000 per megawatt hour. (*See* PJM Tariff § 1.10.1A(d)(viii)). Because FERC approved the PJM Tariff, that rate held the force of federal law. ODEC, as a generator capacity resource, was required to "respond to [PJM's] directives to start, shutdown or change output levels of [its] generation units." *Id.* §1.7.20(b). As ODEC concedes, had it failed to respond to PJM's directives, it would have been forced to declare a "forced outage" and would have been subject to monetary penalties, again, arising under federal law. *Id.* ¶ 1.9.4.

The promises made by PJM, then, did not represent independent contractual terms: they were part and parcel of the relationship and the responsibilities delegated to the Parties under

federal law. The PJM Tariff set the $1000 per megawatt hour rate that ODEC now claims inadequate to compensate it for its losses. The PJM Tariff defined the relationship between the Parties in regard to the interstate provision of electricity. And it set the penalties that ODEC would incur should it fail to live up to its obligations. The instant suit thus falls squarely within the federally defined relationship between ODEC and PJM. And because the instant suit "seeks to alter the terms of th[at] relationship . . . set forth in a filed tariff," this Court possesses subject matter jurisdiction. *Bryan,* 377 F.3d at 429.

ODEC appears to allege that in this circumstance its provision of natural gas to PJM—and the costs associated with such an action—can fall outside the scope of the PJM Tariff. But under the plain language of 16 U.S.C. § 824d, the payments ODEC seeks to recover are for costs made "in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission." 16 U.S.C. § 824d. In accordance with federal statute, all such charges must "be just and reasonable" and any charge "that is not just and reasonable is hereby declared to be unlawful." *Id.* Under its plain language, the governing federal statute leaves scant room for ODEC to maneuver. Absent FERC's blessing, any transmission or sale of electric energy is unlawful. *See Ne. Rural Elec. Mbrshp. Corp. v. Wabash Valley Power Ass'n,* 707 F.3d 883, 887 (7th Cir. 2013) ("[o]nce a rate is accepted, however, the parties to the rate filing are bound to the terms of the filed rate and may not change them without giving notice and making a new filing with FERC"). A party may assert a state law claim for breach of contract, but only where that contract "and breach of that contract . . . both predate the federal tariff." *Id.* at 892. Otherwise, allowing parties—bound by a federal tariff—to bargain for gas outside the tariff rate would undermine FERC's authority to set a reasonable rate for all market participants.

While ODEC's Amended Complaint studiously avoids any mention of federal law, a "plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint." *Franchise Tax Bd.*, 463 U.S. at 22. And even a cursory reading of ODEC's artfully pleaded claims reveal their inherently federal nature. First, the Amended Complaint explains that "to ensure reliability in the PJM Region during the [2014] Polar Vortex, PJM induced ODEC to enter into binding commitments to purchase natural gas." (Am. Compl. ¶ 18.) PJM took measures "to ensure reliability" pursuant to its responsibilities under federal law. (*Id.*) Federal regulations enumerated the measures PJM was entitled to enact. And ODEC's actions in response to PJM's request were also governed by federal regulation. Second, ODEC seeks "damages in the amount of $14,925,669.58"—exactly the same sum it sought before FERC and the D.C. Circuit. (*Id.* ¶ 57.) ODEC sought a waiver from a federal tariff to recover the identical amount of monetary damages in this case, indicating that the damages it seeks arise under the same federal law: the PJM Tariff which capped ODEC's cost recovery at the filed rate of $1000 per megawatt hour.

The conclusion that ODEC's claims arise out of the PJM Tariff and Operating Agreement are borne out by the case law evaluating similar questions. As the United States Court of Appeals for the Second Circuit has stated in the context of the telecommunications market, "tariffs conclusively and exclusively enumerate the rights and liabilities of the contracting parties." *Marcus*, 138 F.3d at 56 (internal quotation marks omitted); *see also*, *Northeastern*, 707 F.3d at 893 n.5 ("In most cases challenging filed rates, a federal court will have jurisdiction . . . a federal regulation forms the basis of the contractual relationship, so any claim necessarily arises under federal law"). Here, ODEC's claims manifestly implicate the governing terms of the PJM

Tariff; terms that carry the force of federal law. As a result, ODEC's seeks to alter a federal tariff, and this Court has jurisdiction.

### b. ODEC's Claims "Effectively Challenge" the PJM Tariff Rate and Violate the Filed-Rate Doctrine

Because ODEC's claims for damages arise under and implicate the PJM Tariff, binding case law teaches us that those claims "effectively challenge[]" the rate set by FERC and run afoul of the filed-rate doctrine. *Bryan,* 377 F.3d at 430.

The purpose of the filed-rate doctrine "is twofold: to prevent discrimination among consumers and to preserve the rate-making authority of federal agencies." *Bryan,* 377 F.3d at 429. ODEC's state law claims would undermine both goals. First, the award of damages to ODEC would have the effect of discriminating between utility generators under the PJM Tariff. As noted above, ODEC is only one of many energy generation utilities that subscribe to the PJM Tariff. For example, Duke Energy (another PJM-contracted generation utility) similarly sought a waiver before FERC for costs incurred during the 2014 Polar Vortex. FERC denied that waiver application, and the D.C. Circuit affirmed that denial. *See Duke Energy Corp. v. PJM Interconnection, L.L.C.,* 151 F.E.R.C. P61,206, 62281 (F.E.R.C. June 9, 2015); *Duke Energy Corp., et. al, v. FERC,* 892 F.3d 416, 422 (D.C. Cir. 2018). Therefore, awarding damages to ODEC here would lead to different rates paid among utility generators. ODEC would pay one rate, while Duke Energy would pay another. As the Fourth Circuit stated in *Bryan,* "an award of damages to the customer-plaintiff would, effectively, change the rate paid by the customer to one below the filed-rate paid by other customers." 377 F.3d at 429 (quoting *Hill,* 364 F.3d at 1316).

Second, awarding damages to ODEC would contravene the rate-making authority of federal authorities and functionally require this Court to set a reasonable rate. As the Supreme Court has stated, "[i]t would undermine the congressional scheme of uniform rate regulation to

allow a . . . court to award as damages a rate never filed with the Commission and thus never found to be reasonable within the meaning of the Act." *Ark. La. Gas Co.*, 453 U.S. at 579. By imposing a roughly fifteen-million-dollar penalty on PJM, the Court would alter FERC's judgment concerning the provision of natural gas and retroactively alter the filed-rate paid during the month of January 2014. Such retroactive ratemaking is forbidden, even by FERC. *See id.* at 578 ("[FERC] itself has no power to alter a rate retroactively").

Indeed, despite addressing cases in different procedural contexts and under different theories of recovery, every administrative agency or court to address ODEC's claims—and other similar cases arising out of the 2014 Polar Vortex—have found that the filed-rate doctrine bars the type of equitable relief ODEC seeks here. For instance, as noted above, Duke Energy sought a waiver under the PJM Tariff itself before FERC for additional costs incurred during the 2014 Polar Vortex. FERC initially determined that the "relief sought by Duke is prohibited by the filed-rate doctrine and rule against retroactive ratemaking" and denied the request for a waiver. *Duke Energy,* 151 F.E.R.C. ¶ 61,206, 62281. The D.C. Circuit affirmed that denial based on filed-rate principles. *Duke Energy,* 892 F.3d at 416.

Similarly, in ODEC's earlier regulatory request for relief from the PJM Tariff, FERC denied ODEC's request for an equitable waiver of the tariff rate, dubbing it "a classic example of a violation of the filed-rate doctrine and the prohibition of retroactive ratemaking." *ODEC,* 154 F.E.R.C. ¶ 61,155 at ¶ 9. The D.C. Circuit, again, affirmed. *ODEC,* 892 F.3d at 1226. Accordingly, this Court must conclude that ODEC now attempts to obtain relief by "clothing [its] federal claim in state garb" meaning that the same outcome results. *Marcus,* 138 F.3d at 55 (internal quotation marks omitted). The Court follows the sound reasoning of FERC and the

D.C. Circuit to find that ODEC's claims for relief arise under a federal tariff and that awarding damages would violate the filed-rate doctrine.

**c.     ODEC Cannot Place Its Economic Relationship with PJM During the 2014 Polar Vortex Outside the Bounds of the PJM Tariff or the Filed-Rate Doctrine**

ODEC challenges the application of *Bryan* to the case at bar while appealing to equitable concerns and contending that it merely brings state law claims. ODEC also cites out-of-circuit decisions which it argues are relevant and support its position. For the reasons articulated below, the Court finds these arguments unavailing.

First, ODEC attempts to differentiate the Fourth Circuit's decision in *Bryan* because the plaintiff in *Bryan* explicitly sought a "refund" of the tariff. *Bryan,* 377 F.3d at 430. Here, in contrast, ODEC suggests that it "does not challenge or allege that the filed rate or any aspect of the Operating Agreement or Tariff is unjust or unreasonable." (Mem. Supp. Mot. Remand. 15, ECF No. 14.) But that argument does not square with a plain reading of *Bryan.* In *Bryan,* the district court had maintained jurisdiction over and resolved all claims directly attacking the tariff. *See Bryan,* 377 F.3d at 427. The district court, however, remanded to state court a solitary claim for "failure to make certain disclosures" regarding the tariff rate in a manner constituting "unfair or deceptive acts or practices" under North Carolina law. *Id.* at 430. The district court concluded that, fairly read, the unfair trade practices claim did not *directly* challenge the tariff rate, but merely claimed that the carrier's method of collecting the tariff violated state law. *See id.* at 427-28.

The Fourth Circuit reversed remand, finding that subject matter jurisdiction existed. *See id.* at 432. While the *Bryan* court recognized that many federal courts had determined that "any award of damages . . . no matter how calculated, would violate the filed-rate doctrine," the court

23

found it unnecessary to reach that question. *Id.* at 431.[14] Because the plaintiff had not separated damages resulting from the tariff itself and the allegedly unfair trade practices carried out by the defendant, the court determined that the complaint "nowhere purports to seek any form of damages other than a refund of some portion of the [tariff]." *Id.* The Fourth Circuit thus found jurisdiction and dismissed on the grounds that the plaintiff's suit sought damages in contravention of federal law. *See id.* at 432.

While ODEC does not explicitly seek a "refund" of the PJM Tariff, its claims, fairly read, seek additional payments not provided for in the PJM Tariff. Like the claims in *Bryan*, ODEC's claims for damages, even though they do not facially challenge the tariff, "would effectively impose a rate different from that dictated" by the FERC-approved tariff and are accordingly invalid. *Id.* at 430. Whether ODEC presents the identical amount in damages it seeks here as a refund or additional payments makes no discernible difference: both are of equal effect and both are equally forbidden.[15]

---

[14] In *Bryan*, the Fourth Circuit referred to two cases cited in this opinion: the Second Circuit's decision in *Marcus v. AT&T Corporation* and the United States Court of Appeals for the Eleventh Circuit's decision in *Hill v. BellSouth Communications, Inc. See* 138 F.3d at 55; 364 F.3d at 1316. In both cases, the courts of appeals confronted virtually identical scenarios to the instant case. A plaintiff sought to bring a state law claim related to, but not directly challenging, a federal tariff. And in both cases, the Second Circuit and Eleventh Circuit found that (1) federal courts had substantial federal question jurisdiction; and, (2) the state law claims for damages challenged the tariff and required the court to impermissibly set a reasonable rate. *See id.*

[15] The subsequent history of the *Bryan* case offers support for this conclusion. After the Fourth Circuit's ruling, the plaintiff amended her complaint in state court to omit any reference to the federal tariff, and pressed only her claims for unfair trade practices. Three years later, the parties were again before the Fourth Circuit. *See Bryan v. BellSouth Communs., Inc.*, 492 F.3d 231 (4th Cir. 2007) ("*Bryan II*"). Despite the plaintiff's amendments, the *Bryan II* court found that the state law claim still possessed the "legal effect of challenging or seeking to change the terms of [a] tariff." *Id.* at 237. Thus, even where federal law was not mentioned, and the state law claims did not challenge the tariff rate itself, the Fourth Circuit found federal jurisdiction which required dismissal under the filed-rate doctrine.

24

Similarly, the nature of the state law claims do not alter the Court's analysis. While ODEC's claims for breach of contract, unjust enrichment, and negligent misrepresentation invoke different common-law theories of recovery, each involves conduct inherently related to the PJM Tariff. Because ODEC's success on these counts would effectively alter the tariff rate during the period in question, the Court may exert jurisdiction, and for the same reasons, dismiss the Amended Complaint.

Second, although ODEC asserts that it does not seek to "challenge a federal tariff," the cases it cites as support run counter to that argument. (Mem. Supp. Mot. Remand 15.) For example, ODEC relies on the United States Court of Appeals for the Seventh Circuit's decision in *Northeastern* for the conclusion that federal jurisdiction does not exist when state law claims "do not challenge a filed tariff." (*Id.*) In that case, the plaintiff sought a declaratory judgment that defendant had breached a *1977 contract* "by taking action *in 2004* that had the effect of transferring regulation of [the defendant's] rates" from a state regulatory agency to FERC. *Northeastern*, 707 F.3d at 886 (emphasis added). The Seventh Circuit found that federal question jurisdiction did not exist because "the complaint alleges a contract and breach of that contract that both predate the federal tariff." *Id.* at 892. Because the plaintiff did not challenge the rate on file with FERC but merely questioned the defendant's legal right to enter into a relationship with FERC under state law, the Seventh Circuit concluded that in such circumstances there could be no federal jurisdiction.

---

As in *Bryan II*, ODEC altered its pleading in state court so as to omit any mention of federal law. But the form of the reimbursement—whether a waiver from FERC or damages in an equitable claim—cannot affect the Court's finding that a transfer of money from PJM to ODEC would violate the filed-rate doctrine.

This case presents an altogether different scenario, and one that the *Northeastern* court foresaw. The Seventh Circuit indicated that the result there would be different if the complaint "alleged wrongdoing . . . based on conduct that occurred *after a* federal tariff was submitted for regulation." *Id.* (emphasis added). This comment makes plain that the Seventh Circuit's analysis turned on the fact that the 1977 contract at issue *predated* the 2004 the federal tariff. Here, the PJM Tariff was in full effect long before PJM and ODEC allegedly entered into an oral contract. Furthermore, the *Northeastern* court recognized that had the plaintiff "brought this action *as a suit for damages* or to enjoin the rate it pays under the filed tariff, the action would be barred by the filed-rate doctrine." *Id.* at 887 (emphasis added). Such a suit, in the Seventh Circuit's view, would impermissibly "alter the rate [the plaintiff] paid for electricity under the FERC tariff." *Id.* at 888. Here, of course, ODEC does not seek a declaratory judgment, but seeks damages. Thus, under any reading of *Northeastern*, federal question jurisdiction exists in this case.

Third, and finally, to the extent that ODEC appeals to equitable considerations, the Court, even if inclined to do so, cannot allow those arguments to prevail. As the Supreme Court has stated in the context of the filed-rate doctrine, "when a court is called upon to decide whether state and federal laws are in conflict, the fact that the state law has been violated does not affect the analysis." *Ark. La. Gas Co.,* 453 U.S. at 584. ODEC may very well bring meritorious claims under state law. But the merits of those claims are not at issue.[16] ODEC's allegations effectively challenge federal law, and would require this Court to second-guess the binding judgment of a

---

[16] As one court has noted, adherence to the filed-rate doctrine "is undeniably strict, and it obviously may work hardship in some cases" such as the case at bar. *Marcus,* 138 F.3d at 59. But the filed-rate "embodies the policy which has been adopted by Congress . . . to prevent unjust discrimination" and must be applied regardless of equitable reasons for departing from the filed-rate. *Id.* (internal quotation marks omitted).

regulatory agency. "No appeal to equitable principles can justify this usurpation of federal authority." *Id.*

As part and parcel of its finding that ODEC's lawsuit improperly challenges a federal tariff, the Court concludes that it possesses jurisdiction under the *Gunn-Grable* framework. Under that framework, in order to determine whether the Amended Complaint raises a substantial federal question, this Court must ascertain whether ODEC's claims present a federal question which is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Appalachian Power Co.*, 842 F.3d at 303 (internal quotation marks omitted).

This case necessarily raises a challenge to a federal tariff that bears the force of federal law. Both Parties dispute the applicability of the PJM Tariff to the conduct at issue here—the sale of natural gas during the 2014 Polar Vortex. And that question, which implicates the structure and reliability of the Mid-Atlantic energy grid, is substantial. Finally, as evinced by the Fourth Circuit's decision in *Bryan*, that question is capable of resolution in this Court without disrupting the federal-state balance Congress created.

This does not surprise. Courts have recognized that, "[i]n most cases challenging filed rates, a federal court will have jurisdiction . . . a federal regulation forms the basis of the contractual relationship, so any claim [like one here] necessarily arises under federal law." *Northeastern*, 707 F.3d at 893 n.5. That holds true here. While ODEC contends that the Amended Complaint "does not challenge or allege that the filed rate or any aspect of the Operating Agreement or Tariff is unjust or unreasonable," the inherently federal gist of the Amended Complaint speaks volumes. (Mem. Supp. Mot. Remand. 15.) The Court does not foreclose the possibility that somehow, in rare circumstances, parties bound under a federal tariff

might be able to bring state law claims that do not implicate the tariff rate.[17] This, however, is not that case. ODEC's state law claims for breach of contract, unjust enrichment, and negligent misrepresentation clearly arise under, implicate, and challenge provisions of the PJM Tariff, approved by FERC. Because those state law claims "effectively challenge[]" federal law and all four prongs of the *Gunn-Grable* framework are met, they violate the filed-rate doctrine. *See Bryan,* 377 F.3d at 430. This Court has subject matter jurisdiction.

## V. Conclusion

Because ODEC's claims effectively challenge a federal tariff and would require this Court to set a reasonable rate, and because these claims satisfy all factors of the *Gunn-Grable* test, the Court must dismiss the case. As the Fourth Circuit noted in *Bryan,* there is no daylight between the question of jurisdiction and dismissal in regard to claims that challenge federal tariffs. *See* 377 F.3d at 432. An action seeking to "alter" a federal rate presents a federal question. *Id.* And because any attempts to effectively alter that rate challenges federal law, "that claim must be dismissed pursuant to the filed-rate doctrine." *Id.; see also, Hill,* 364 F.3d at 1317 (finding that the district court should have both asserted jurisdiction and dismissed the complaint where plaintiff's "claims implicate[d] the filed-rate doctrine"). In light of, and consistent with, that binding precedent, the Court will dismiss ODEC's state law claims, and this action.

---

[17] As the Second Circuit noted in *Marcus,* "there is no complete preemption without a clear statement to that effect from Congress." 138 F.3d at 55. While "federal law may dominate the consideration of most claims" relating to federal energy tariffs, "only Congress can say that federal law dominates the form of these claims as well." *Id.*

For the foregoing reasons, the Court will deny ODEC's Motion to Remand, and will grant PJM's Motion to Dismiss the Amended Complaint.

An appropriate order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Date: 3/31/20
Richmond, Virginia